UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ANTHONY KYLES,**<br><br>Plaintiff,<br><br>vs.<br><br>**COUNTY OF OAKLAND, *et al.*,**<br><br>Defendants. | 2:22-CV-12973-TGB-APP<br><br>**ORDER GRANTING DEFENDANT TOWNSEND'S MOTION TO DISMISS**<br><br>**(ECF NO. 28)** |

Anthony Kyles spent nearly 25 years in prison on four convictions for second-degree murder from 1997. Last year, the Oakland County Circuit Court vacated his convictions as wrongfully obtained.

Kyles now brings this action against Oakland County, the City of Pontiac, the state prosecutor who handled his trial, and several other law enforcement officials involved in investigating and prosecuting him, asserting claims for the violation of his constitutional rights, *see* 42 U.S.C. § 1983, and state law.

Gregory Townsend, the state prosecutor, has moved to dismiss the claims against him on the ground of absolute prosecutorial immunity. ECF No. 28. For the reasons below, the motion will be **GRANTED**.

I. FACTUAL ALLEGATIONS

*A. The Fire*

Early one morning in September 1995, Jacqueline Etchen and her boyfriend, Robert Perry, awoke to one of her six children screaming that

their room in the couple's Pontiac, Michigan home was on fire. ECF No. 1, ¶¶ 15, 22. Perry jumped out of bed and rushed to the room. ¶ 23. As he attempted to extinguish the fire, he yelled to Etchen that a defective space heater was its source; the couple's gas had been shut off for nonpayment, and a friend had tried to "fix" the heater—which had a bad power cord—by splicing it with a cable from a lamp. ¶¶ 16-17, 24-25. Etchen and three of her children managed to escape to safety. ¶ 26. Perry and the other three children perished in the burning building. ¶ 30.

Etchen told first responders that the jerry-rigged heater was the cause of the devastation. ¶ 31. But investigators later decided to treat the fire as arson caused by an incendiary—and the deaths as homicides. ¶¶ 33-35. They did so even after tests for the presence of an accelerant on the front porch, where they believed the fire had started, came back negative. ¶¶ 34-35. In short order, a Joint Task Force—which included detectives from the Oakland County Sheriff Department and the Pontiac Police Department, as well as a Special Agent from the Federal Bureau of Investigation—was assigned, according to the complaint, to "investigate the circumstances of the fire and secure a conviction against anyone charged." ¶¶ 36-37.

## B. *The Investigation*

Kyles says that, over the course of a nearly two-year investigation, Task Force investigators conspired to fabricate evidence against him—in particular, by bullying a witness, Keith Hollimon, into testifying falsely

that he saw Kyles start the fire. ¶¶ 38-39, 69. It is unclear from the complaint why the Task Force zeroed in on Kyles as a suspect or even how Hollimon knew Kyles. What is clear is that Hollimon had some criminal history and had recently been arrested for breaking and entering into some apartments. ¶ 41. It appears that some investigators from the Task Force were also investigating those burglaries. ¶¶ 41-42.

During an interview about the burglaries, the complaint alleges, a Task Force detective "randomly" asked Hollimon if he knew anything about the fire—and offered to help with the burglary case if Hollimon could provide information. ¶¶ 42-44. Despite this promise, Hollimon initially denied knowing anything. ¶ 45. Nevertheless, according to the complaint, Task Force investigators continued to question him about the fire over the course of multiple interviews. ¶ 46.

Kyles alleges that Hollimon, faced with mounting pressure from his criminal case and increasingly improper methods of interrogation from Task Force investigators, eventually started telling shifting stories about the fire. ¶¶ 46-71. First, Hollimon told investigators that he had overheard Kyles talking about the fire. ¶ 50. Later, he said that he had been in the vicinity and heard cries for help coming from the burning house. ¶ 52. Still later, he said that he had seen Kyles at the scene of the fire, standing across the street. ¶ 57. Finally, having been spoon-fed the story investigators wanted him to tell during an interview in January 1996, Hollimon stated that Kyles had started the fire. ¶ 58.

3

Task Force detectives remained unsatisfied. When Hollimon tried to backtrack from any implication that he had *seen* Kyles start the fire—telling them "No, no, no, no … wait a minute, wait a minute … I seen him coming … away[,] I didn't see him start … the fire"—the improprieties multiplied. ¶¶ 66-68. Among other things, Task Force investigators told Hollimon they were going to seek the death penalty for Kyles, so Hollimon would need to "watch [his] back" if Kyles made it out of jail—and they also promised him safety and threatened him with violence. ¶¶ 61-64, 65, 68. Eventually, according to the complaint, Hollimon told the investigators what they wanted to hear: that he had witnessed Kyles light a Molotov cocktail and throw it at Etchen's home. ¶ 69. (Still later, at the prompting of the investigators, Hollimon said, alternatively, that the house was firebombed and pipe bombed. ¶ 89. Another witness was also pressured. One of Etchen's friends, who had initially told investigators that Kyles was not the type to kill people and named other possible suspects, changed her story to say that Kyles may have started the fire to send a message. ¶¶ 78-85.)

Kyles alleges that, because the Oakland County Prosecutor's Office had a custom of prosecuting cases only after a primary witness passed a polygraph test, Defendants devised a plan that would enable Hollimon to "pass"—so they could charge Kyles with murder and secure a high-profile conviction. ¶¶ 73-74. Defendants knew that Hollimon had failed at least one polygraph test by January 1996. ¶ 76. Accordingly, they employed

4

Chet Romatowski, their preferred polygraph examiner (who is not a party to this case), to achieve their goal of having Hollimon pass a polygraph examination. ¶ 77.

According to the complaint, as the state prosecutor who later tried the case against Kyles, Defendant Gregory Townsend worked with and conspired with Task Force members to develop and fabricate evidence both during and after investigation. ¶ 94. The complaint provides few details about his pre-trial involvement but describes the actions of some other lawyers involved. For instance, Kyles alleges that, in February 1996, a federal prosecutor who worked with the Task Force spoke with the state prosecutor in charge of Hollimon's burglary case (not Townsend) about Hollimon's cooperation in the arson investigation. *See* ECF No. 1-20 (February 23, 1996 letter from federal prosecutor to Hollimon's counsel memorializing that federal prosecutor had spoken to "APA Lisa Madzia" after Hollimon "offered to assist law enforcement authorities in an ongoing federal investigation"); ECF No. 1, ¶ 93. Ultimately, as a result of his cooperation, Hollimon was sentenced to a single year in prison for the burglaries, despite being a habitual offender—well in advance of Kyles's trial. ¶¶ 95, 107.

### C. The Trial

In Spring 1997, Kyles was arrested and charged. ¶¶ 99-100. During his trial later that year, the complaint charges, Townsend argued that Kyles intentionally started the fire at Etchen's house even though he

5

knew—or should have known—that the evidence he was using was tainted and improperly gathered. ¶ 101. The complaint alleges that Townsend suppressed material exculpatory and impeaching evidence during the trial, such as Etchen's initial account of the tragedy and letters about Hollimon's cooperation with law enforcement, and instead presented false evidence (including testimony from Task Force detectives) that the fire began on the porch and was the result of arson. ¶¶ 102-04, 234. According to the complaint, though Townsend knew that Hollimon had received a favorable plea deal in exchange for his participation in the "arson" investigation, he assured the jury during closing arguments that Hollimon received no such deal and was not promised any favorable treatment in exchange for his testimony:

> The defense would have you believe that Keith Hollimon is making this whole story up. His testimony is nothing but falsehoods. Why? Because they believe the defense is suggesting to help himself get a better deal, to help himself out. Ladies and gentlemen, that doesn't make sense.
>
> What benefit did Keith Holliman get? None[.] What does he get out of this? Nothing except the fact that now he decides to testify in open court against Anthony Kyles. What promises were made to Keith Hollimon? None. Well, I take that back, there was one promise. And as you heard from Detective Goodrich the only promise. He promised [w]hat Keith Hollimon needed and wanted in order that he would come forward and testify, the promise that they would do their very best to keep him safe and keep his family safe from being injured or killed.

¶¶ 107-08, 112-13; ECF No. 1-16, PageID.542-43.

6

In October 1997, a jury found Kyles guilty of four counts of second-degree murder. ¶ 116. The state trial court sentenced him to life in prison. ¶ 116.

### D. Exoneration

Over a decade later, Hollimon recanted his testimony after receiving a letter from Kyles's daughter. ¶¶ 117-18. In letters, Hollimon explained how he had been pressured by Task Force members into testifying falsely against Kyles. ¶¶ 117-25. Based on the recantation, Kyles applied to the Michigan Innocence Clinic, which found fire and electrical experts to challenge evidence from Kyles's trial. ¶¶ 125-35. These experts, who worked on Mr. Kyles's case pro bono, opined that the cause of the fire at Etchen's home was the defective space heater and that no credible scientific information established it was an arson. ¶¶ 135, 139. Armed with these reports, the Michigan Innocence Clinic approached the Oakland County Prosecutor's Conviction Integrity Unit in 2021. ¶179. After the Unit's expert reviewed the trial evidence and agreed that the fire could not have been the result of an arson, the Unit joined a petition by the Michigan Innocence Clinic to have Kyles's convictions vacated. ¶¶ 180-82, 184, 187.

On October 12, 2022, Oakland County Circuit Court Judge Daniel O'Brien entered an order vacating Kyles's convictions. ¶ 185. After spending nearly 25 years behind bars for a crime that the evidence showed he did not commit, Kyles was released from prison. ¶ 188.

7

According to the complaint, there have been other wrongful convictions attributable to Townsend and the Task Force investigators that have also come to light. ¶¶ 143-59. Townsend has retired but the Michigan Department of the Attorney General is performing a comprehensive audit of his work. ¶ 159.

### *E. The Complaint*

In December 2022, Kyles filed an eleven-count complaint against Oakland County, the City of Pontiac, the investigators of the Joint Task Force that investigated him, and state prosecutor Gregory Townsend. ¶¶ 5-14. Seven causes of action relate to Townsend: (1) a § 1983 claim for *Brady* violations [Count I]; (2) a § 1983 claim for fabrication of evidence [Count II]; (3) a § 1985 claim for conspiring to violate Kyles's civil rights [Count III]; (4) a § 1983 claim for malicious prosecution [Count IV]; (5) a § 1983 for continued detention without probable cause [Count V]; (6) a claim for gross negligence in violation of MCL § 691.1407 [Count IX]; and (7) a claim for malicious prosecution under Michigan law [Count X].

Townsend has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), as have many of the other defendants. This order addresses Townsend's motion only.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion tests whether a

8

complaint has satisfied that requirement. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).

In evaluating whether a plaintiff has set forth a plausible claim, the Court accepts as true all well-pleaded factual allegations. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "[M]ere conclusions," however, "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. And "[t]hreadbare recitals of the elements of a cause of action," devoid of further factual enhancement, will not do. *Id.* at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotations omitted).

### III. DISCUSSION

Townsend seeks dismissal of the claims against him in full on the ground of absolute prosecutorial immunity. ECF No. 28.

#### A. Advocacy Versus Investigation

"American law has long recognized absolute immunity for those whose special functions or constitutional status requires complete protection from suit." *Price v. Montgomery Cnty.*, 72 F.4th 711, 719 (6th Cir. 2023) (quotations omitted). In *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976), the Supreme Court extended this immunity to state prosecutors acting with the scope of their prosecutorial duties in connection with the

initiation and pursuit of criminal prosecutions. It reasoned that anything less—such as qualifying that immunity—would "disserve the broader public interest" by "prevent[ing] the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427-28. But it did not address the question whether these same considerations supported a grant of absolute immunity to prosecutors when their duties that cast them into more investigatory or administrative roles. *Id.* at 430-31.

Two decades later, in *Burns v. Reed*, 500 U.S. 478, 493 (1991), the Court answered the question it had reserved in *Imbler*: a prosecutor's investigatory and administrative actions—unrelated to preparation for initiating or conducting a prosecution—are *not* entitled to absolute immunity. *Burns* concerned a § 1983 suit challenging two actions by a prosecutor: (1) giving legal advice to the police concerning the existence of probable cause for an arrest and the propriety of hypnotizing a suspect, and (2) participating in a probable cause hearing. *Id.* at 481.

The Supreme Court held that only the in-court action was entitled to absolute immunity. *Id.* at 491-92. It reasoned that, while imposing potential liability for advising the police did "carry with it some risk of burdensome litigation," what justified the extension of absolute immunity to state prosecutors was a "concern with interference with … conduct closely related to the judicial process"—*not* "merely a generalized concern with inference with an official's duties." *Id.* at 494. The Court

10

acknowledge that the absence of qualified immunity for advising the police *could* cause prosecutors to be more sparing and cautious in their actions outside the courtroom. *Id.* at 495. But, it noted, "where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate"—and the doctrine of qualified immunity was available to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 494-95 (internal quotations omitted, emphasis in original). The threat of "harassment and intimidation associated with litigation" based on advising the police was insufficient to justify the protection of absolute immunity for such actions, especially in the absence of any historical or common law precedent. *Id.* at 494.

The key inquiry in deciding if a prosecutor is entitled to absolute immunity, thus, is whether the conduct at issue happened in the prosecutor's role as an advocate—or as a legal advisor to the police or administrative manager of a criminal investigation. To answer it, courts apply a "functional" approach—looking to the "nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quotations omitted). The Supreme Court has acknowledged that the line between investigation and advocacy can often be blurred. *Id.* at 272-74; *see also Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999) ("The line between conduct that is part of a preliminary investigation and conduct that is intimately associated

11

with the judicial phase of a criminal proceeding is difficult to draw in some cases"). But the decades since *Imbler* have produced a number of examples of activities falling on both sides of the line.

Prosecutors function as advocates when they professionally evaluate evidence assembled by the police or are required to make judgment calls as to how present evidence for the initiation of criminal proceedings, handle pre-trial proceedings, conduct a trial, use witnesses, and present evidence. So, actions such as "prepar[ing] and filing … the information and the motion for an arrest warrant," *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997); "making statements at a preliminary examination about the availability of a witness," even if those statements are false or misleading, *Adams v. Hanson*, 656 F.3d 397, 399 (6th Cir. 2011); "meeting with a witness in preparation for her trial testimony," *Alexander v. Harrison*, No. 21-1828, 2022 WL 13983651, at *4 (6th Cir. Oct. 24, 2022); "knowingly us[ing] false testimony and suppress[ing] material evidence" during a trial, *Imbler*, 424 U.S. at 413; and even successfully pressuring a key witness into destroying exculpatory evidence during an ongoing prosecution, *Price*, 72 F.4th at 720; are entitled to absolute immunity from civil liability.

But when prosecutors assist in investigations before a charging decision has been made, they are generally considered to take on more investigatory and administrative roles—for which they are entitled only to qualified immunity. Examples of this kind of conduct include: giving

12

"legal advice to the police," *Burns*, 500 U.S. at 492, especially "prior to the existence of probable cause," *Prince*, 198 F.3d at 614-15; "directing the investigation … and pushing officers to execute … arrests and raids," *Rieves v. Town of Smyrna*, 959 F.3d 678, 694 (6th Cir. 2020); and acting as complaining witnesses and making sworn statements to the court in support of criminal complaints, *Kalina*, 522 U.S. at 129-31. The Supreme Court has emphasized that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274.

### B. Application

As the party claiming that his actions should be protected by absolute immunity, Townsend bears the burden of establishing that his challenged behavior was prosecutorial in nature and intimately associated with the judicial process. *Id.*

Townsend argues that the only specific allegations in the complaint about his actions—*i.e.*, that he presented false evidence and testimony to the jury, suppressed exculpatory and impeaching evidence after the case was charged, and falsely told the jury that Hollimon received no benefit in exchange for his testimony against Kyles—relate to his role as an advocate. He notes that there are no allegations that he was either a member of the Joint Task Force investigating the case or that he ever interviewed Kyles during the investigation. And any allegations about actions he took outside the courtroom, he says, are entirely conclusory.

13

Ultimately, having scoured the complaint for allegations about pre-prosecution activities by Townsend, the Court agrees. The only allegation that directly concerns Townsend's involvement in the investigation before Kyles's arrest is that:

> As the Oakland County assistant prosecutor in charge of the prosecution of Mr. Kyles, Defendant Townsend worked and conspired with the officer/detective Defendants and Defendant Hollimon to help develop and fabricate evidence during and after the investigation against Mr. Kyles related to the fire. ¶ 94.

This paragraph makes a general allegation but does not contain any detail about specific actions Townsend allegedly took to develop and fabricate any evidence.

Kyles maintains that he has pleaded sufficient facts concerning Townsend's pre-prosecution involvement in the investigation, including his work with detectives to fabricate evidence and the events leading to the decision to swear out an affidavit for Kyles's arrest. ECF No. 38, PageID.1082. But the closest examples of these "facts" fail to link Townsend to the investigation with any specificity. Kyles alleges that:

- [U]pon information and belief, at all relevant times, *the Oakland County prosecutor's office* had a custom or practice to prosecute cases only when their primary witness passed a polygraph test. ¶ 73.
- *Defendants* devised a plan to have Defendant Hollimon "pass" the polygraph examination, so they could charge Mr. Kyles with murder, among many other charges, and secure a high-profile conviction. ¶ 74.

14

- All *Defendants* were fully aware that Defendant Hollimon failed at least one polygraph test, which occurred on or around January 1996. ¶ 76.
- *Defendant[s]* would employ their regular, go-to polygraph examiner/polygraphist, a Chet Romatowski, with the objective of having their primary witness pass a polygraph examination to have cover to prosecute a targeted suspect (or victim) to secure high-profile convictions. ¶ 77.
- *Defendants* influenced, conspired, or participated in the initiation of Mr. Kyles's criminal prosecution by deliberately and knowingly supplying false information and omitting material information which showed a reckless disregard for the truth in requesting an arrest warrant, swearing to facts in support of probable cause, and/or lying at the preliminary examination, which were material to a finding of probable cause. ¶ 246.

From these allegations, Kyles asks the Court to infer that Townsend was involved in advising Task Force members regarding the existence of probable cause, in helping them find a polygraphist who could administer an examination Hollimon would be able to pass, and in swearing out an affidavit for Kyles's arrest.

The problem with these allegations as they pertain to Townsend is that detail is missing. While Kyles describes with specificity what actions Task Force members took against him in interrogating Hollimon and other witnesses, he provides no detail about any overt, individual, pre-prosecution act by Townsend. The claims against Townsend rest on vague allegations that he was part of an amorphous group of "Defendants" that conspired to fabricate evidence against Kyles. *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) ("Summary reference to a

15

single, five-headed 'Defendants' does not support a reasonable inference that *each* Defendant is liable.")

The Court recognizes that a plaintiff is not required to affirmatively prove the merits of his case at the complaint stage; Rule 8 require only that he set forth a short and plain statement of facts that, if true, would entitle him to relief. But the gravamen of Kyles's claims against Townsend is that he conspired with Task Force investigators to unlawfully obtain a high-profile conviction. And "conspiracy claims must be pled with some degree of specificity;" "vague and conclusory allegations unsupported by material facts will not be sufficient to state such … claim[s] under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). Simply saying that "Townsend fabricated evidence" is nothing more than a conclusion: it does not say what he did, how he did it, or what evidence was fabricated.

Moreover, the materials Kyles attached to his complaint undermine the inferences he asks the Court to make. Kyles suggests that, as an assistant Oakland County prosecutor, Townsend necessarily must have been involved in procuring a favorable plea deal to induce Hollimon to testify falsely at trial. But the letters he offers regarding the deal all involve attorneys other than Townsend; they implicate a federal

16

prosecutor and a different assistant prosecuting attorney.[1] Without additional details, the Court is unable to infer that Townsend played a role in the investigation stage of the case. Rather, the complaint suggests that his role began only after charges had already been filed.

As to the state law claims against Townsend, Kyles contends that, at the very least, his claims for gross negligence and malicious prosecution under Michigan law must survive. ECF No. 38, PageID.1092. To support this contention, he cites MCL § 49.153, which defines the duties of Michigan state prosecutors, and MCL § 691.1407—which

---

[1] For example, a February 23, 1996 letter from Assistant U.S. Attorney Michael J. Stern addressed to Hollimon's defense attorney states:

> Per your request, this letter will serve to acknowledge that your client, Keith Hollimon, has offered to assist law enforcement authorities in an *ongoing federal investigation.* To date Mr. Hollimon has offered a debriefing, the details of which we discussed during an earlier telephone conversation.
>
> Should Mr. Hollimon continue to offer his assistance I will keep you apprised of such. Further, at the appropriate time *I will provide Judge Schnelz with details concerning Mr. Hollimon's assistance. I have already spoken to APA Lisa Madzia regarding this matter and am sending her a copy of this letter.*

ECF No. 1-20 (emphasis added). The Court also notes that the copy of the criminal complaint provided by Townsend as an attachment to his reply brief shows that the complaint was supported by Task Force investigator Nolan Gottschall and authorized by APA Gary Tunis. ECF No. 41-2. Again, Townsend's name does not appear in connection with any pre-charging deals or legal advice to the police.

17

delineates the scope of statutory immunity for state officials. *Id.* Kyles argues that, because the "authority to manufacture probable cause using a jailhouse informant and polygraph before filing charges" is absent from the statute delineating a prosecutor's duties and authorities, Townsend cannot be immune to these claims. ECF No. 38, PageID.1092-93.

But Michigan courts recognize common-law prosecutorial immunity as a complement to this statutory grant of immunity. *See, e.g.*, *Fifield v. City of Lansing,* No. 221755, 2001 WL 1134607, at *3 (Mich. Ct. App. Sept. 21, 2001) ("[W]e need not decide whether the assistant prosecutor's conduct rises to the level of gross negligence because he is absolutely immune from liability under the common law for his quasi-judicial actions."); *Bischoff v. Calhoun Cnty. Prosecutor*, 434 N.W.2d 249, 252-53 (Mich. Ct. App. 1988) ("Plaintiff argues that … the conduct of defendant, in advising the village attorney of the police report and releasing it to him, is not the kind of quasi-judicial activity entitled to absolute immunity. We think that a federal court, applying the federal standard, might well agree with plaintiff … We are not prepared to read into the statutory provision a distinction between quasi-judicial and administrative or investigative activity."); *see also McCollum v. Bahl*, No. 08-00096, 2008 WL 5396248, *5 (W.D. Mich. Dec. 18, 2008) (surveying relevant case law and concluding that "the Michigan governmental tort liability act did not displace common law prosecutorial immunity"). Thus, Townsend's activity here would seem to be protected under Michigan's

18

statutory immunity regardless of whether it was investigative or advocacy in court.

### IV. CONCLUSION

The conduct alleged in the complaint—that a prosecutor was suppressing material evidence and presenting the false argument that a cooperating witness received no benefit in exchange for his testimony— is reprehensible and deserving of the harshest opprobrium; it is far beneath and directly contrary to the professional responsibility and public trust that should inhere in the position of a prosecuting attorney. But federal law gives such officials absolute immunity from civil liability—even for those kinds of inexcusable actions—if they occur while a prosecutor is acting as an advocate in a matter before the court while participating in it. *See Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010). In the absence of any specific allegations that Townsend committed these kinds of condemnable acts in the course of either advising the officers, or managing the investigation before charges were brought, the complaint as to Townsend must be dismissed.

Accordingly, **IT IS ORDERED** that Townsend's motion to dismiss is **GRANTED**, and the claims against Townsend are **DISMISSED without prejudice**. If Kyles has additional details to provide to rectify the deficiencies identified above concerning his claims against Townsend, he must file a motion to amend his complaint with a proposed amended

19

complaint attached, and Defendant may respond as to whether the amendments would be futile.

**SO ORDERED** this 30th day of September, 2023.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge